467 F.2d 1397
 ILLINOIS CITIZENS COMMITTEE FOR BROADCASTING, a
not-for-profit association, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and the United States of
America, Respondents, Sears, Roebuck & Company, Intervenor.
 No. 72-1436.
United States Court of Appeals,
Seventh Circuit.
 Argued July 19, 1972.
Decided Sept. 8, 1972.
 
 Marshall Patner and Thomas R. Meites, Jeffrey Jahns, Chicago, Ill., for petitioners.
 John W. Pettit, Gen. Counsel, Joseph A. Marino, Associate Gen. Counsel, R. Michael Senkowski, Atty., F.C.C., Thomas E. Kauper, Asst. Atty. Gen., George Edelstein, Atty., Dept. of Justice, Washington, D. C., for respondents.
 Harry M. Plotkin, Peter Tannenwald, Gary M. Epstein, Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., Leo H. Arnstein, Burton Y. Weitzenfeld, Louis A. Lehr, Jr., Chicago, Ill., for intervenor.
 Before SWYGERT, Chief Judge, and CUMMINGS and STEVENS, Circuit Judges.
 SWYGERT, Chief Judge.
 
 
 1
 This is an appeal from an order of the Federal Communications Commission dismissing petitioners' complaint for want of jurisdiction. Petitioners are the Illinois Citizens Committee for Broadcasting, an organization concerned with the protection and improvement of television broadcasting, and five individuals who are members of that organization and television viewers. The suit is brought on behalf of the petitioners, all television viewers in the Chicago area, future Chicago broadcast licensees, and nine television stations. On February 17, 1972, petitioners filed a complaint with the FCC, stemming from their investigations into the impact that construction of an office building by Sears, Roebuck & Company (the "Sears Tower") would have on television reception in the Chicago area. The complaint charged principally that the proposed Sears Tower would throw "multiple ghost images" on television receivers in many areas of the Greater Chicago Metropolitan Area. They called upon the FCC to take steps to prevent this interference including, if necessary, an order directing Sears to "cease and desist from the construction of Sears Tower as presently designed until it has taken all actions necessary to protect the rights of complainants and those they represent to an adequate signal." In FCC Memorandum Opinion and Order, FCC 72-460, issued June 1, 1972, the Commission denied petitioners' requested relief on the grounds that it lacked jurisdiction over construction of the Sears Tower. Petitioners have appealed that decision.[1]
 
 
 2
 Petitioners can point to no express language in the statute upon which to base their claim. Rather, they look generally to the legislative history of the Federal Communications Act, in which the Federal Communications Commission (hereinafter, "FCC") is characterized as possessing "broad authority" over communications,[2] judicial opinions which have underscored the need for a flexible construction of the agency's power to enable it to respond to a changing communications technology,[3] and general principles of administrative law which suggest that an agency can regulate conditions "which may directly frustrate the success of the regulation undertaken by Congress."[4] As an example, they document the history of the FCC's regulation of community antenna television (CATV).[5] The FCC initially maintained that it had no jurisdiction over CATV since it fit within neither of the two areas specified in the Act, namely, broadcasters, under Title III, or common carriers, under Title II. Several years later, however, the Commission reversed itself and the Supreme Court, in United States v. Southwestern Cable Co., 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968), sustained that reversal. The Court grounded the FCC's authority in Title I of the Act, construing section 152(a) of that chapter as conferring an independent grant of authority over "all interstate . . . communication by wire or radio." The section reads:
 
 
 3
 (a) The provisions of this chapter shall apply to all interstate and foreign communication by wire or radio and all interstate and foreign transmission of energy by radio which originates and/or is received within the United States, and to all persons engaged within the United States in such communication or such transmission of energy by radio, and to the licensing and regulating of all radio stations as hereinafter provided; but it shall not apply to persons engaged in wire or radio communication or transmission in the Canal Zone, or to wire or radio communication or transmission wholly within the Canal Zone.[6]
 
 
 4
 Petitioners interpret Southwestern Cable as carving out a new category of FCC regulation. The Act's provisions apply not only to "persons engaged in communications or transmission" and "radio stations" but also "the communications in themselves." Moreover, according to their argument, if the "communications" are within the FCC's power to regulate, so are all activities which "substantially affect communications," in this case, the construction of a very tall office building.
 
 
 5
 While we appreciate the need for a flexible appraoch to FCC jurisdiction,[7] we believe the scope advanced by petitioners is far too broad. The "affecting communications" concept would result in expanding the FCC's already substantial responsibilities to include a wide range of activities, whether or not actually involving the transmission of radio or television signals much less being remotely electronic in nature. Nothing before us supports this extension. In Regents of University System of Ga. v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363 (1950), the Court restricted the means of regulation at the FCC's disposal, even in an area clearly within the Commission's province. The Court held that while the Commission could impose conditions relating to the broadcaster's financial condition as an adjunct to its power to grant licenses to broadcast, it could not directly affect the broadcaster's contractual obligations to a third party. Thus, a state could require damages for breach of contract notwithstanding the FCC's decision that the contract be repudiated before the license was granted.[8] Moreover, Southwestern Cable, which we agree sets up an additional area of FCC regulation, also contained words of restriction:
 
 
 6
 There is no need here to determine in detail the limits of the Commission's authority to regulate CATV. It is enough to emphasize that the authority which we recognize today under Sec. 152(a) is restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting. . . . We express no views as to the Commission's authority, if any, to regulate CATV under any other circumstances or for any other purposes. 392 U.S. at 178, 88 S.Ct. at 2006.
 
 
 7
 The Court appeared to be treading lightly even where the activity at issue easily falls within sections 151, 152(a), 153(a) and (b), as being "communication by wire or radio," and "transmission of . . . signals, pictures, and sounds of all kinds." Thus, we do not understand how the limited extension of the Commission's jurisdiction to a hybrid activity like CATV,[9] but one nevertheless within the category of a signaltransmitting facility, justifies regulation of any and all activities that "substantially affect communications."
 
 
 8
 Indeed to so find where building construction is concerned would be to enmesh the FCC in a variety of local considerations and an often complex local regulatory scheme. After hearings on the impact of the World Trade Center, a proposed New York City office building, on television reception, the presiding FCC Commissioner noted that the FCC had no authority "to regulate in any way the construction of buildings . . . and that this matter is presently strictly one of local concern and regulation."[10] In the Matter of Investigation of Television Interference to be Caused by the Construction of the World Trade Center by the Port of New York Authority, (Docket No. 17483), 10 P & F Radio Reg.2d 1769 (1967). Indeed, the issue was framed only in terms of whether the FCC would authorize broadcasters to move from the Empire State Building, to the World Trade Center, which was to exceed the height of the former. No one suggested that the FCC consider supervising the construction of the World Trade Center:
 
 
 9
 No witness in this proceeding advocated that the Federal Government exert, or interpose, any jurisdiction designed to control the height or location of structures in any municipality in the context of their effect on television transmission and reception. Indeed, the only testimony relating to this matter was to the effect that it would be unwise for the Federal Government to inject itself into this complicated local problem.
 
 
 10
 While another specialized federal agency, the Federal Aviation Agency, does have some responsibility in this area, particularly when building heights threaten to obstruct air navigation routes, these duties have been authorized by Statute, 72 Stat. 797, 49 U.S.C. Sec. 1501 (1958), and not by judicial inference. Moreover, even here, the agency may only make an advisory determination that a proposed structure constitutes a "hazard," Air Line Pilots' Ass'n Int. v. Dep't of Transportation, 446 F.2d 236, 240 (5th Cir. 1971). It may not issue cease and desist orders directed against the building's construction, the remedy urged upon us by the petitioners.
 
 
 11
 We can find no comparable provisions in the Federal Communications Act. While the FCC has important responsibilities to promote effective radio and television transmission throughout the country, and thus to minimize interference with radio and television signals, its authority is limited to situations in which the interference is created by, to use the Commission's words, "a signalgenerating" or "signal-producing" facility. Sections 152 and 153 refer only to transmission facilities. Section 302a(a) authorizes the FCC to make reasonable regulations governing the "interference potential of devices which in their operation are capable of emitting radio frequency energy by radiation, conduction, or other means in sufficient degree to cause harmful interference to radio communications." Since the construction of the Sears Tower fits within none of these categories, we agree with the FCC's finding that it lacks jurisdiction to regulate.
 
 
 12
 The Commission's order dismissing petitioners' complaint is affirmed.
 
 
 
 [1]
 Sears, Roebuck & Company has intervened in the instant proceeding
 
 
 [2]
 H.R.Rep. 1850, 73d Cong., 2d Sess. 1
 
 
 [3]
 See, e. g., National Broadcasting Co. v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 87 L.Ed. 1344 (1943); Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220, 225 (1967); General Television Co. of Cal. v. FCC, 134 U.S.App.D.C. 116, 413 F.2d 390, 405 (1967)
 
 
 [4]
 American Trucking Ass'ns v. United States, 344 U.S. 298, 311, 73 S.Ct. 307, 315, 97 L.Ed. 337 (1953). In addition, the FCC's general power to issue regulations to carry out the provisions of the Act is specifically mentioned in three sections, Secs. 154(i), 303(f), and 303(r)
 
 
 [5]
 The FCC has defined CATV systems as "any facility which . . . receives directly or indirectly over the air and amplifies or otherwise modifies the signals transmitting programs broadcast by one or more television stations and distributes such signals by wire or cable to subscribing members of the public who pay for such service, but such term shall not include (1) any such facility which serves fewer than 50 subscribers, or (2) any such facility which serves only the residents of one or more apartment dwellings under common ownership, control, or management, and commercial establishments located on the premises of such an apartment house." 47 C.F.R. Sec. 74.1101(a)
 
 
 [6]
 48 Stat. 1064, 47 U.S.C. Sec. 152(a) (1964)
 
 
 [7]
 See, e. g., Note, The Wire Mire: The FCC and CATV, 79 Harv.L.Rev. 366, 369-72 (1965)
 
 
 [8]
 Buckeye Cablevision, Inc. v. FCC, 128 U.S.App.D.C. 262, 387 F.2d 220 (1967), suggests that the Court's holding in Carroll stemmed from the FCC's lack of authority at that time to issue cease and desist orders. They imply that the subsequent grant of such power by the Congress casts doubt on the continuing viability of Carroll. However, the Supreme Court in United States v. Southwestern Cable, supra, 392 U.S. at 173 n. 37, 88 S.Ct. 1994, simply distinguished Carroll without, we believe, undermining its precedential value
 
 
 [9]
 It was claimed initially that CATV was outside the scope of the Act because it possessed "certain of the characteristics both of broadcasting and of common carriers, but with all of the characteristics of neither," and as such, "elud[ed] altogether the Act's grasp." 392 U.S. at 172, 88 S.Ct. at 2002
 
 
 [10]
 The Commissioner characterized his remarks as his "personal informal views" which were "not to be construed as formal findings or conclusions in any sense." We cite them as illustrative only, and not for their precedential value